Estate of Johanna K. W. Hailman, Peoples First National Bank & Trust Company, Executor v. Commissioner.
Estate of Hailman v. Commissioner
Docket No. 65030.
United States Tax Court
T.C. Memo 1958-165; 1958 Tax Ct. Memo LEXIS 63; 17 T.C.M. (CCH) 812; T.C.M. (RIA) 58165; August 29, 1958
James M. Arensberg, Esq., First National Bank Bldg., Pittsburgh, Pa., for the petitioner. Gerald Backer, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the income tax of Johanna K. W. Hailman of $1,686, $1,352.06, and $776.68 for 1952, 1953, and 1954, respectively. The only issue for determination is the correctness of the respondent's action in disallowing as a deduction in each *64 of the years an amount of $3,000 taken by her as a loss incurred in business as an artist. Findings of Fact Some of the facts have been stipulated and are found accordingly. Johanna K. W. Hailman, sometimes hereinafter referred to as decedent, was born in 1870 and died June 28, 1958. She was a resident of Pittsburgh, Pennsylvania, and filed her income tax returns for the calendar years 1952, 1953, and 1954 with the director in that city. During the taxable years involved herein, as well as for many years prior thereto, the decedent was a social leader in the Pittsburg community and was active in civic and charitable organizations. She was instrumental in organizing a group to take care of and finance Phipps Conservatory, a place in Pittsburgh for the display of flowers. She also was instrumental in causing the creation of a Board for Park and Recreation Activities in Pittsburgh. The decedent enjoyed gardening and was greatly interested in horticulture. On the spacious grounds surrounding her home are some of the most beautiful gardens in Pittsburgh. For her activities in horticulture she was awarded a gold medal by the Garden Club of America. In 1956 she also was honored by *65 a group of women's clubs for her civic and art activities and was designated "a distinguished daughter of Pennsylvania." At an early age the decedent became interested in art and in painting. Prior to and during the years in controversy she maintained her studio on the grounds on which her home is situated. The studio, situated about 150 to 200 feet from her residence, is a one-story, four-room with passageway structure, with full basement. It is heated and equipped with all utilities and is a "very delightful studio." There is no artist in Pittsburgh who has a studio comparable to it. The decedent usually went to Florida in the fall and returned in the spring. While in Miami she used a room in her residence there for a studio. During the taxable years here involved the decedent had good standing as an artist throughout the United States and was one of the leading artists in western Pennsylvania. Although she painted other things, she specialized primarily in paintings of flowers and portraits. During her career as an artist to 1958, the petitioner did at least 500 or 600 paintings. Including portraits, which were painted as commissions, she sold a total of approximately 50 paintings *66 during the period 1920 to 1953. Prior to and during the taxable years involved the decedent received a substantial income from property owned by her and from a trust which was created by her deceased husband. The following is a statement of the decedent's receipts from the sale of her paintings and her expenses incidental to making and selling paintings as reported by her in her income tax returns for the indicated years and the amounts of expenses allowed as deductions by respondent: Amount of
Expenses Al-
Receipts
Expenses
lowed as a
Year
Reported
Reported
Deduction
1936
None
None
None
1937
$1,250.00
$ 4,533.43
$ 4,533.43
1938
None
1,455.53
549.34
1939
500.00
4,830.10
3,000.00
1940
None
7,490.63
3,000.00
1941
500.00
5,791.38
3,000.00
1942
500.00
8,611.89
3,000.00
1943
None
5,729.52
3,000.00
1944
350.00
6,227.69
3,000.00
1945
650.00
5,599.65
3,000.00
1946
1,250.00
9,922.51
3,000.00
1947
1,000.00
8,046.08
3,000.00
1948
None
12,605.37
3,000.00
1949
1,200.00
7,524.99
3,000.00
1950
None
7,870.77
3,000.00
1951
None
10,069.47
3,000.00
1952
None
9,654.77
None
1953
None
7,718.80
None
1954
None
6,457.75
None
Total
$7,200.00
$131,140.33
$44,082.77
*67 Although she had not made any sales of her paintings after 1949, the decedent deducted in her income tax returns for each of the years 1952, 1953, and 1954 an amount of $3,000 as a loss incurred in business as an artist. These amounts, which were disallowed by respondent and are in controversy here, were attributed by decedent in her income tax returns to the following expenditures which were listed in the respective returns as expenses incidental to her business as an artist: 1952
1953
1954
Automobile expenses including depreciation (1952
only)
$1,595.67
$ 752.10
$ 767.36
1/2 to Studio
$ 797.84
$ 376.05
$ 383.68
Studio Expenses
Salaries
Mary Hall
$2,100.00
$2,100.00
$2,100.00
Milton Kelly-Custodian
1,800.00
Angelo Napolitano
281.62
Bertram Hall
2,350.00
2,400.00
2,400.00
Utilities
747.47
385.55
282.42
Studio supplies & printing
49.24
175.46
28.42
Insurance
723.20
895.79
$8,051.53
$5,956.80
Social Security & Hospitalization
188.85
153.40
$4,964.24
Clubs
Rolling Rock Club
$ 210.00
$ 225.85
Fox Chapel Club
132.00
$ 192.40
143.20
Pittsburgh Golf Club
138.00
556.30
294.60
Allegheny Country Club
158.40
165.80
Women's Industrial Exchange
25.00
West Penn Cot Club
80.00
Women's National Farm & Garden Club
2.00
100 Friends of Pittsburgh Art
10.00
Carnegie Institute Society
10.00
10.00
Western Pa. Historical Society
10.00
Garden Club of Allegheny County
25.00
25.00
Western Pa. Kennel Association
5.00
National Geographic Society
6.00
6.50
Garden Club of America
25.00
25.00
Women's Home and Garden Club
2.00
Pittsburgh Athletic Association
37.46
Duquesne Club
375.22
$ 805.40
$ 980.50
$1,109.83
Total expenses
$9,654.77
$7,502.20
$6,457.75
Deduction taken
$3,000.00
$3,000.00
$3,000.00
*68 Mary Hall, Bertram Hall, Milton Kelly and Angelo Napolitano were employed as domestic help by the decedent during the years here involved. Angelo Napolitano was a chauffeur and general handyman who worked for the decedent during January 1952. Milton Kelly was the custodian of decedent's vacation home in Florida and took care of the house and grounds during the summer season. Bertram Hall was the decedent's chauffeur, butler, and general handyman about her home and her studio and on some occasions took photographs of persons and scenes which she desired to paint. His wife, Mary Hall, performed general housekeeping tasks in the decedent's home and in her studio. She did the decedent's cooking and washing, kept decedent's clothes in order, took general care of the decedent including when decedent was ill, assisted in the handling of the decedent's social correspondence, and, on occasions when decedent was painting from a photograph, modeled for decedent. During the years 1952 through 1954 decedent's personal friends belonged to and were entertained by decedent at the Pittsburgh Golf Club. One of decedent's paintings, "Magnolia Macrophylla," which was completed a short time prior *69 to 1952 was exhibited in the International Exhibition held at Carnegie Institute in Pittsburgh in 1952. The selling price asked by decedent for the painting was $700. Another of her paintings, "The Amaranthust," which was completed in 1953 was exhibited at the Playhouse in Pittsburgh during that year. The selling price asked by the decedent for that painting was $1,500. The decedent continued to own the foregoing paintings at the time of the trial herein. During the taxable years involved here decedent engaged in painting another picture, "Pells," which was exhibited in the International Exhibition held at Carnegie Institute in 1955 and which she continued to own at the time of the trial. The decedent did not employ an artist's representative or agent to sell her paintings but offered them for sale in special exhibitions in Pittsburgh and various other places. The decedent took great pride in her paintings and while interested in selling them, she refused to accept offers therefor which she deemed inadequate. In refusing such offers it was her intention to continue to hold the paintings until she could obtain the price which she considered she should get and which she considered *70 was necessary in order to maintain her prestige as an artist. For a number of years prior to and extending into the taxable years involved herein, the decedent's financial adviser engaged with her attorneys and her personal business manager in the matter of planning not only for the decedent's financial future but also as to what should be done with her paintings and other objects of art. During the middle 1940's, at a time when decedent's income from sources other than her activities as an artist was declining and it was necessary for her to use principal to support herself, and continuing thereafter until her personal business manager's death in 1953, her financial adviser and her personal business manager had various discussions respecting the decedent's affairs. When asked why there was not a more extensive sale of decedent's paintings which would tend to relieve the financial restriction which the decedent was under, the personal business manager replied that he did not wish to hear the price of the paintings which might result in an increased sale of them. He expressed the view that for a painter of decedent's reputation and standing it was necessary that the prices of her *71 paintings be maintained not only from the standpoint of current sales but from the standpoint of the substantial inventory of paintings in her studio which it was anticipated would become part of her estate at her death. As late as 1954 there were "paintings around the studio in great numbers." The decedent's activities as an artist during 1952, 1953, and 1954 were not conducted as a trade or business or with the intent of making a profit or obtaining a livelihood therefrom. The expenditures taken as deductions for the taxable years 1952 and 1953 were neither ordinary and necessary expenses of carrying on a trade or business nor losses within the meaning of section 23 of the Internal Revenue Code of 1939. The expenditures taken as deductions for the taxable year 1954 were neither ordinary and necessary expenses of carrying on a trade or business within the meaning of section 162 of the Internal Revenue Code of 1954 nor losses within the meaning of section 165 of that Code. Opinion The petitioner takes the position that the record clearly establishes that during the taxable years in question, as well as for many years prior thereto, decedent was engaged *72 in the trade or business of making paintings and selling them and that the respondent erred in not allowing her a deduction of $3,000, or some lesser amount, for trade or business expenses incurred in each of the years in question. The respondent's position is that the record taken as a whole fails to establish that the decedent's activities as an artist constituted the carrying on of a trade or business by her and that, accordingly, his disallowance of the deductions in question was proper. The petitioner contends that neither the fact that the business engaged in by decedent may not have proved profitable nor the fact that she may not have chosen the best way to sell her paintings is determinative of the question of whether she was engaged in a trade or business during the taxable years here involved. The petitioner contends that the proper test to be applied is that set forth in Doggett v. Burnet, 65 Fed. (2d) 191 (C.A.D.C., 1933), which involved the question of whether the taxpayer in that case was engaged in a trade or business during the taxable year there in controversy. In that case the court said: *73 "The proper test is not the reasonableness of the taxpayer's belief that a profit will be realized, but whether it is entered into and carried on in good faith and for the purpose of making a profit, or in the belief that a profit can be realized thereon, and that it is not conducted merely for pleasure, exhibition, or social diversion. * * *" In Chaloner v. Helvering, 69 Fed. (2d) 571 (C.A.D.C., 1934), the same court had before it the question of whether the taxpayer in that case was engaged in a trade or business during the taxable years there in controversy. In that case the court said: "A business, under the statute, is defined by the Supreme Court as 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' Flint v. Stone Tracy Co., 220 U.S. 107, 171, 31 S. Ct. 342, 357, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. In Deering v. Blair, 57 App. D.C. 367, 23 Fed. (2d) 975, 976, this court stated the rule as follows: *74 'An occupation or employment will not be excluded from the classification of business merely because it actually results in loss instead of profit; but it is essential that livelihood or profit be at least one of the purposes for which the employment is pursued.'" The primary question for determination is whether the decedent's art activities were "entered into and carried on in good faith and for the purpose of making a profit, or in the belief that a profit can be realized thereon." The record is silent as to just when the decedent began making paintings and offering them for sale or when she began painting portraits. However, there is some indication in the record that one of her paintings was exhibited in the First International Exhibition held at Carnegie Institute in 1896 and that in almost all subsequent International Exhibitions at Carnegie, to and including that of 1955, a painting of hers was exhibited. If the decedent began offering her paintings for sale in 1896 and began the painting of portraits in that year, there is a period of approximately 40 years from the beginning of her art activities as to which we have no evidence as to the number of sales of paintings, or *75 the receipts from such sales or from the painting of portraits, or expenses incidental to the making and selling of paintings or as to the profits, if any, from her art activities. It is true that there is evidence to the effect that, including portraits which were painted as commissions, the decedent sold a total of approximately 50 paintings during the period 1920 to 1953. From a consideration of the prices asked by decedent for the paintings exhibited by her in 1952 and 1953 ( $700 and $1,500, respectively) in connection with her receipts from sales of paintings for the years 1936 through 1953, it would appear that by far the greater portion of the 50 paintings sold during the period 1920 to 1953 was sold prior to 1936 and therefore occurred during the 40-year period mentioned above. Although it would appear that, including portraits, she sold a substantial number of paintings prior to 1936, the record is silent as to what profits, if any, were realized from such sales. Although the record for the 18-year period, 1937 through 1954, is more informative as to receipts and as to expenses incidental to the making and selling of paintings, we are unable to find therein any substantial *76 basis for concluding that during that period the decedent was carrying on her art activities for the purpose of making a profit. Total receipts from such activities for the 18 years amounted to $7,200 or an average $400of per year. In no year did receipts exceed $1,250. In 9 years, including the last 5, of the period there were no receipts whatever. For the 18-year period total expenses incidental to the decedent's art activities amounted to more than $131,000 or an average of approximately $7,285 a year, or 18 times the average annual receipts. The decedent enjoyed painting and was able to carry on her art activities for such a long period with a ratio of expenses to receipts of 18 to 1 because of her substantial independent income from sources other than her art activities. Such a situation strains credulity to conclude that the purpose of decedent's art activities was to earn money as contrasted with purposes of pleasure, exhibition, or social diversion. Cf. Henry P. White, 23 T.C. 90, affd. 227 Fed. (2d) 779. Especially is this true in view of the evidence relating to the decedent's practice in pricing her paintings at amounts which she considered *77 she should get in order to maintain her prestige as an artist and her refusal to accept lower amounts. The decedent's pricing practice not only limited the sales of her paintings but resulted in the accumulation in her studio of paintings in "great numbers" which persons closely connected with her affairs anticipated would become at her death part of her estate. The respondent's action in denying the deductions in question is sustained. Decision will be entered for the respondent.